**FREDERICK B. STEVENS, Inc., et al. v. STEEL & TUBES, Inc.**

No. 8289.

Circuit Court of Appeals, Sixth Circuit.

Oct. 9, 1940.

H. A. Toulmin, Jr., of Dayton, Ohio, (Toulmin & Toulmin, H. A. Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, on the brief), for appellants.

Drury W. Cooper, of New York City, (Drury W. Cooper and Earnest D. Given, both of New York City, and Wm. B. Belden, of Cleveland Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and ARANT, Circuit Judges.

SIMONS, Circuit Judge.

Begun as a patent infringement suit and resulting below in the dismissal of the bill, the issues presented for decision by the appeal involve not merely the validity of patents, but because of the defense of license express and implied, an interpretation of contracts entered into by the parties, originally and in settlement of controversies that later arose. Consideration of the validity of the patent claims in suit and the question of their infringement, will be re-

quired only if we find untenable the appellee's defense of license.

The patents involved, though now owned by appellants jointly, each issued to appellant Hannon. They are No. 1,913,757, for a coating machine whereby to enamel the insides of tubes, and No. 1,936,247, for a process of applying corrosion resisting coats to pipes; the first issued June 13, 1933, upon an application filed July 1, 1929, and the second November 21, 1933, upon an application filed June 25, 1928. The alleged infringing machines are two; one built for the appellee under contract by the Stevens Company and, because installed from the beginning in appellee's Brooklyn plant referred to as the Brooklyn machine; the other, built by the United States Galvanizing Company, and originally installed in the plant at Warren, Ohio, is called the Warren machine. The Galvanizing Company was licensed by the appellants under the 757 patent. While there is no denial of license to use either machine as originally designed, it is the contention of the appellants that the defendant rebuilt each so as substantially to increase its capacity; that the reconstruction came within the scope of the patent claims; that, not being limited to replacement and repair, the reconstruction constituted infringement under the rule applied in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816; Lyman Mfg. Co. v. Bassick Mfg. Co., 6 Cir., 18 F.2d 29; Cinema Patents Co., Inc., v. Columbia Pictures Corporation et al., 9 Cir., 62 F.2d 310, and other cases; and that the increased production of the machines over that of the machines as they were originally designed and built, due to the reconstruction, is the measure of the infringement.

The situation that led to the building of the Brooklyn machine and the filing of the patent application, is important to an understanding of the contract problem involved. The defendant is a manufacturer of conduits for electric wiring systems and the Stevens Company a manufacturer of plating apparatus. Prior to the period involved, thin walled electrically welded steel tubing had not been in use for electric wire conduits. The defendant, having developed such thin walled tubes in 10' lengths, having received the approval thereupon of the Underwriter's Laboratory, and conceiving that there existed a satisfactory market for such tubing, sought apparatus that would automatically produce it in various diameters at a cost commercially advantageous. On June 15, 1928, it accepted the Stevens proposal for building and installation of a machine to perform the three separate steps of the manufacturing operation,—(1), galvanizing interior and exterior walls of the tubing; (2), enameling interior walls; and (3), baking the tubes. We are concerned only with the second operative step since the patents, both for machine and process, relate to interior enameling.

The contract for the Brooklyn machine contains the following provision: "It is understood that your requirements are 14,-000 pieces of ½", ¾" and 1" conduit tubes, each 10' long, which are to be galvanized on the outside and black enameled on the inside in 23 hours."

It also provided that, in the event the manufacturer was not able to demonstrate the equipment to operate as specified within 60 days after installation, the purchaser might call upon it to remove the equipment, whereupon the plaintiff would refund the purchase price theretofore paid. The price of the Brooklyn machine was $45,795, in addition to which the defendant agreed to pay for necessary electric equipment to complete the installation.

A controversy having arisen after the installation, a settlement agreement was entered into between the parties, on May 18, 1929, whereby they released each other from all obligations of the June 5, 1928 agreement, the appellants waiving a balance still due of $11,795, refunding to Tubes $5,000 of the purchase price which it had already paid, and agreeing to execute instruments of title to Tubes for all of the equipment. Two of the provisions of this settlement agreement become, by virtue of the divergent contentions of the parties, with respect to them, important to the solution of the problem. They are paragraph 4, which reads: "Concurrently with the consummation of this agreement by delivery of said instruments by Stevens to Tubes, Stevens shall execute and deliver to Tubes appropriate instruments indemnifying Tubes against all loss, cost or damage, including litigation expense arising out of litigation based upon alleged infringement of patents in the manner and form provided for in said agreement dated June

5, 1928; provided, however, that said indemnity shall apply only to activities by Tubes in respect to said equipment in the manner contemplated in connection with the operation of said equipment as designed and engineered by Stevens."

And paragraph 5, which reads: "At the time of the consummation of this agreement, Stevens will execute and deliver to Tubes appropriate instruments, licensing Tubes in respect to activities in connection with said equipment under any and all patents, applications for patents, or rights in patents which Stevens now has or may acquire to the end that Tubes and its successors and assigns shall have the right to use equipment so provided herein to be acquired, free and clear from any patent claims, by Stevens or any successor of Stevens in the chain of title of any patents or patent rights now owned or hereinafter acquired by Stevens."

The defendant contends that the Brooklyn machine was incapable of achieving agreed capacity in the enameling operation. To understand the matter of its reconstruction requires brief description of the machine as installed and as shown in the drawings and specifications of the 757 patent thereafter issued. It consists of a table upon which a track supports a reciprocating conduit carrying car. Fixed spray guns mounted on flexible metal tubes in register with the work, convey compressed air and enamel into the conduits from each end through half their length. The spray carrying tubes require support to hold the guns in position until they are in telescopic relation to the work, and means are required to automatically move such supports aside when the spray guns are in contact, and automatically to restore the supports when the guns are withdrawn after the spraying process. It may, for purpose of decision, be conceded that the mechanical arrangements are ingenious and the combination patentable.

■ The machine, as originally furnished, had three 5' spray extensions at either end. By the defendant's first reconstruction, three 10' spray extensions at but one end were substituted. It is the defendant's contention that the machine spraying half the length of the conduit, from each end, as originally designed, brought about an overlapping of the enamel on the inside of the tube and prevented successful baking at that point. By its second reconstruction the defendant added two additional 10' flexible sprays. The appellants assert this increased production capacity 66⅔ percent. The response is that it permitted the slowing down of the cycle of reciprocation to get a better product, in required quantity. The master found that without the changes and improvements made by the defendant, it could not have produced a satisfactory product in quantity which approached that specified in the original agreement, and while the defendant was not limited to the quantity there specified, since that was a minimum and not a maximum limit, it had not, at any time, exceeded the specified production except in negligible quantity, and so there was failure of proof that the appellants were deprived of business by the changes made in the machine. The master's findings are based upon evidence and inference reasonably drawn. Having been approved by the court we accept them in the absence of clearly recognized mistake.

■ The contention of the appellants that the specified productive capacity of the Brooklyn machine was a minimum limit so as to constitute production beyond it, infringement, is not persuasive. The provision is referred to by both parties as a guaranty of capacity, as undoubtedly it was, and as a guaranty it must be construed as imposing a liability upon the vendor and not a limitation upon the vendee. It would be rare in experience for the purchaser of a newly designed machine to be concerned with the lowermost level of its production, or for the vendor to prescribe its maximum limit of use. The master was not in error in construing the provision as a minimum.

■ But whether maximum or minimum the appellants point to the settlement agreement as absolving them from all obligation as to the productive capacity of the machine, since each of the parties thereby released the other from all obligations set forth in their agreement of June 5, 1928. This contention confuses the concept of guaranty with that of license. Granted that it released the seller from liability for inadequate performance, it could not impose an obstacle to the use of a machine which had been bought and paid for.

■■ This aside, however, we find the settlement agreement to contain an express license to use the equipment, free and clear of any patent claims, by Stevens or its successor in title of any patents or patent rights owned or thereafter acquired by Stevens. The appellants urge that this license grant is qualified by the language of paragraph 4 of the settlement agreement which limits the obligation there assumed to activities in respect to the equipment "as designed and engineered by Stevens." We do not so interpret the contract. Par. 5, by clear language, grants a license without limitation. Par. 4 is an indemnity clause to protect the vendee against patent litigation, whatever the source of challenge. The two paragraphs relate to different subject matter and the one does not qualify or limit the other. Our conclusion is that there has been no infringement of the appellants' patent rights in the reconstruction and use of the Brooklyn machine.

As indicated, the Warren machine was built for the defendant by the United States Galvanizing Company. After it had been installed, the appellants advised the defendant that the machine would infringe patents subsequently expected to issue to them upon applications pending. An interference had, however, been declared in the patent office between the Hannon application and certain claims of a Potthoff application owned by the Galvanizing Company. This was settled by agreement which included the grant to the Galvanizing Company of a non-exclusive license under any patents to issue on the Hannon applications, confined to such of their claims as were involved in the interference and covered common subject matter. The license specifically included apparatus installed by the Galvanizing Company prior to the issue of the patents. The Warren machine, built and installed prior to the agreement, is defended as within the license.

■ The appellants contend, however, that claims 16 and 17 of the 757 patent were not involved in the interference, and so are not within the grant to the Galvanizing Company. But the appellants had sought in the patent office to add claims 16 and 17 as counts in the interference. It may not now be said that these claims were not involved when the license was executed. There had been no decision in the patent office with respect to them prior to the settlement. They relate to common subject matter and are within the license. The Warren machine was freed by the agreement from all claims later issued to Hannon in the 757 patent.

The single claim of the 247 patent is for: "The process of coating the interior surface of an elongated tube, which includes the steps of supporting the tube and moving the tube into alignment with the spraying device by moving the supporting means, inserting a spraying device into the tube, withdrawing the spraying device, and as it is withdrawn operating said device to coat the interior of the pipe, moving the tube out of alignment with the spraying device and subsequently moving an additional tube into alignment with the spraying device."

The appellants construe this claim to describe the operation of the Warren machine, and contend that there was no license to use the process. The claim of the 247 patent calls for movement of the spraying device into and out of the tubes, while in the Warren machine the tubes move over the spray devices, which are fixed. If these practices are not equivalent there is no infringement. If there is equivalency in this reversal of operations, then there was an equitable implied license to use the patented process. The claim of the 247 patent was filed subsequent to the grant of the license, with knowledge of the principle of operation of the Warren machine which then stood exonerated of infringement. If the machine could not be used without infringing the 247 patent, it would be inequitable to permit the appellants to nullify their license grant. As the master pointed out, there is no proof in the record that anyone but the appellants knew what was contained in the Hannon application which ripened into the 247 patent. Had the Galvanizing Company understood that the Warren machine, as built, could be operated only in manner described in a pending application, it is reasonable to infer that the license, by apt language, would have specifically included permissive use of the patented process.

■■ There is ample authority for the rule that where the owner of a patent grants to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the

grant. Victory Bottle Capping Co. v. O. & J. Machine Co., 1 Cir., 280 F. 753; Scovill Mfg. Co. v. Radio Corp. of America, D.C.N. Y., 9 F.Supp. 239; Edison Electric Light Co. v. Peninsular Light, Power & Heat Co. et al., C.C.Mich., 95 F. 669. The defense of implied license must be sustained.

The decree dismissing the bill is affirmed.