## NATIONAL RUBBER MACHINERY CO. v. McNEIL MACHINE & ENGINEERING CO.

No. 9143.

Circuit Court of Appeals, Sixth Circuit.

Dec. 17, 1942.

---

J. Ralph Barrow and Robert Guinther, both of Akron, Ohio (J. Ralph Barrow and Robert Guinther, both of Akron, Ohio, and Robert W. Wilson, of Cleveland, Ohio., on the brief), for appellant.

Albert L. Ely and Cletus G. Roetzel, both of Akron, Ohio (Albert L. Ely, Cletus G. Roetzel, Ely & Frye, and Wise, Roetzel & Maxon, all of Akron, Ohio, on the brief), for appellee.

Before HICKS, SIMONS and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

Suit by National Rubber Machinery Company, appellant (herein called National), against the McNeil Machine and Engineering Company, appellee (herein called McNeil), for infringement of Claim 11 of Patent No. 2,169,146 issued August 3, 1939, to National, assignee of Iverson.

The purpose of the invention is to provide a simple, compact, powerful press unit for use in vulcanizing tires, inner tubes and other rubber articles. The claim calls for a "multiple press. * * *"

In its answer McNeil denied infringement and set up the special defense that under a contract with National dated January 30, 1939, it was licensed to manufacture "vulcanizing presses identical with those shown in the photostat attached to plaintiff's bill of particulars * * *" and that by reason of the license National was estopped to prosecute this suit.

Following opening statements by counsel, the court announced that it would try the contract phase of the case first. The question involved in the contract was, whether McNeil was licensed to manufacture "dual presses" as distinguished from single presses, about which there was no dispute. The view taken by the court was, that if McNeil was licensed to manufacture dual presses, all other questions were necessarily foreclosed. The court found in substance, —that National and McNeil were competitors in the manufacture and sale of machinery used in the manufacture of automobile tires; that the vulcanizing press charged to infringe was the McNeil "dual" or "twin" press which it had started to manufacture in 1938; that it had received substantial orders therefor and had made shipments prior to January 30, 1939, the date of the license contracts; that National was fully informed of McNeil's manufacture and sale, from sometime in 1938, of dual presses of the construction charged to infringe; that National was the owner of certain safety mechanisms covered by Maynard Patent No. 1,987,908, designed to be used in connection with vulcanizing presses; that in December 1938, in contemplation of a large prospective order from the Goodyear Tire & Rubber Company for dual presses, McNeil approached National to negotiate a license to use the Maynard safety device in connection with presses it was manufacturing or contemplated manufacturing; that there ensued a series of conferences in which Summit Mold & Machine Company, another press manufacturer, participated; that as a result of the negotiations, two contracts were entered into on January 30, 1939, the first granting McNeil and Summit the right to manufacture and sell vulcanizing presses embodying the inventions of the patents set forth in the body of the agreement, the second providing for payment of royalties on vulcanizing presses including dual presses made and sold by McNeil prior to the date of the agreements; that "In these two contracts dual presses were specifically mentioned and * * * minimum prices * * * at which dual presses might be sold were set out"; that the contracts did not limit the manufacture and sale to a particular type of press; that the contract provided for the payment of royalties based upon the sales prices of the press and that McNeil paid National royalties thereunder, based upon the agreed percentage, to the amount of $33,000 plus, of which amount over $25,000 was paid for twin or dual presses charged to be an infringement of the patent in suit; that Summit paid over $5,000 for dual presses under the same agreement; that National knew McNeil had been making and selling dual presses and intended to and did use the licensed mechanism in its dual presses; that prior to and during the negotiations National was pros-

ecuting the application for the Iverson patent in suit and was attempting during the entire period to obtain a claim on the dual press construction, which efforts culminated in the allowance of Claim 11 of the patent in suit; that at no time during the negotiations and not until the day of the issuance of the patent did National notify McNeil that it was seeking to secure a patent which would abridge the right of Mc-Neil to manufacture dual presses under the terms of the first contract; that National had full knowledge of McNeil's dual presses and of its purpose to continue the manufacture and sale of presses embodying the safety and control mechanisms; that fair dealing and conduct required National to disclose its intention and purpose of nullifying the license agreement in respect to dual presses as soon as it could secure a patent on the application then pending; that the contracts, the conduct of the parties and operations under the contracts support the defense of license relied upon by McNeil.

Upon these findings the court concluded as a matter of law that the patent in suit was owned by National; that the contracts of January 30, 1939, by their terms gave McNeil the right and license to manufacture and sell dual presses of the type and form shown on McNeil's Exhibits 1 and 2.

The appeal is from a decree dismissing the bill.

We find nothing in the record that warrants a disturbance of the findings or decree. See Canadian Nat. Ry. Co. v. Jones Co., 6 Cir., 27 F.2d 240, 243. The evidence supports the findings. National knew McNeil manufactured dual presses before the contracts were entered into, and that McNeil's reason for seeking the license was that it might bid upon the order from the Goodyear Company calling for dual presses equipped with certain controls covered by National patents.

We are of the opinion that the first contract, McNeil's Exhibit 5, which here concerns us, expressly licensed McNeil to "make, use or sell tire vulcanizing presses," not simply patented attachments thereon; and that Schedule A attached to Exhibit 5 clearly indicates that manufacture of "dual presses" was contemplated under the licensing agreement in that it established as a basis for royalties minimum prices for "dual type" vulcanizers.

National contends that dual presses were not licensed under the contract, pointing to Schedule B thereof, which excepted certain applications for patents not in issue, and which includes the application for the Iverson patent here in suit. We are not impressed. It is so plain that dual presses were licensed, that this contention at most injects a mild element of uncertainty as to the meaning of an agreement otherwise clear, and does not require rejection of the court's conclusion.

Even if the contract were not so clear, we thing the decree merits affirmance upon the authority of Frederick B. Stevens, Inc., v. Steel & Tubes, Inc., 6 Cir., 114 F.2d 815, 819, in which we said: "There is ample authority for the rule that where the owner of a patent grants to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the grant. Victory Bottle Capping Co. v. O. & J. Machine Co., 1 Cir., 280 F. 753; Scovill Mfg. Co. v. Radio Corp. of America, D.C.N.Y., 9 F. Supp. 239; Edison Electric Light Co. v. Peninsular Light, Power & Heat Co. et al., C.C.Mich., 95 F. 669. The defense of implied license must be sustained."

The decree is affirmed.