**MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Plaintiff-
Appellant,**

v.

**E. I. du PONT de NEMOURS & COM-
PANY, Defendant-Appellee.**

**No. 18856.**

United States Court of Appeals,
Seventh Circuit.

Aug. 26, 1971.

Rehearing Denied Sept. 14, 1971.

Edward A. Haight, Chicago, Ill., Harold J. Kinney, St. Paul, Minn., Britton A. Davis, Chicago, Ill., for plaintiff-appellant; Haight, Hofeldt & Davis, Chicago, Ill., Cruzan, Alexander, Kinney, Alexander, Sell, Steldt & De La Hunt, St. Paul, Minn., of counsel.

W. Philip Churchill, Charles P. Baker, New York City, Frank F. Fowle, Chicago, Ill., Raymond E. Blomstedt, Wilmington, Del., E. Manning Giles, Pope, Ballard, Kennedy, Shepard & Fowle, Chicago, Ill., for defendant-appellee; John O. Tramontine, Fish & Neave, New York City, of counsel.

Before SWYGERT, Chief Judge, and KERNER and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

This appeal concerns the construction of an agreement settling an interference declared by the Patent Office. The question is whether, in light of the provisions of the agreement and the accompanying circumstances, one of the parties to the agreement is estopped to assert against the other its later-issued patent, the application for which was pending, but undisclosed, at the time of the settlement.

The question arises out of an action instituted by Minnesota Mining and Manufacturing Company (3M) against E. I. du Pont de Nemours and Company (DuPont) for the alleged infringement of a patent owned by 3M issued to Honn and Sims, No. 3,313,854, claiming invention in fluorinated elastomeric copolymers. DuPont raised an estoppel defense based on an agreement in settlement of an interference between certain applications owned by the parties and related to the same subject matter as the Honn and Sims patent. This defense was separated for determination in advance of the other issues. On the basis of a stipulation of facts and documents, the district court held that 3M was estopped and entered judgment for DuPont. 3M has appealed.

The following is a summary of the facts underlying the estoppel issue. In 1950 the M. W. Kellogg Company contracted with the United States Army to conduct research in the development of new compositions of synthetic rubber. Among those employed by Kellogg in this work were chemists Francis J. Honn, Willard M. Sims and Elizabeth S. Lo. In 1957 Kellogg sold its synthetic rubber business, including related patents and patent applications, to 3M. Among the applications sold to 3M was one filed on September 30, 1955 on behalf of Lo which claimed invention in elastomeric copolymers of hexafluoropropene (HFP) and vinylidene fluoride (VF$_2$).[1] Another of the patent applications acquired by 3M from Kellogg had been filed on behalf of chemists Honn and Sims on April 3, 1953. This application resulted ultimately in the issuance of the patent in suit on May 9, 1967.[2]

During the 1950's DuPont also conducted research in the development of new synthetic rubber products. On April 27, 1955 it filed on behalf of its employee Dr. Dean R. Rexford a patent application which claimed invention in essentially the same elastomeric copolymers of HFP and VF$_2$ as that claimed by Lo. In 1956 DuPont announced publicly that it had developed a new synthetic rubber product known as Viton A, and during 1957 it sold various quantities of this product under the trademark Viton. During this same period (1957–58) 3M began producing a similar product known experimentally as KEL-F 2140 which it sold under the trademark Fluorel. By April 1958 each party knew that the other was producing an elastomeric copolymer of HFP and VF$_2$.

In May 1958 officials of the two companies discussed the possibility of the Patent Office's declaring an interference. They agreed that a settlement should be considered and negotiated if, and when, the interference was actually declared. On June 9, 1958 the Patent Office declared an interference between the applications of Rexford and Lo. Thereafter, during June and July 1958, meetings were held by officials and attorneys of the two companies for the purpose of reaching a settlement. On September 4, 1958 an agreement was signed.

The preamble of the agreement stated that "it is the desire of each of the parties to secure for itself freedom under any patent issued to the other to the extent hereinafter provided and, if possible, to reduce the costs and time in the prosecution of the interference." The agreement provided that the parties would compare evidence and submit stip-

---

1. When hexafluoropropene and vinylidene fluoride are chemically reacted together in certain proportions, the product is known as an elastomeric copolymer which is a rubbery composition used for molded articles, insulation, film, etc., where a tough, heat-stable rubber product is desired.

2. The parent application filed in 1953 was S.N. 346,800. A continuation-in-part of this application was pending throughout the period of the negotiations leading up to the settlement agreement. In February 1960 the claims of the application were divided; and a patent, not here in suit, was issued on December 20, 1960. The remaining claims resulted in the issuance of the patent in suit.

ulated statements to the Patent Office for an award of priority and that no appeal would be taken by either party from a final decision. Under Article II, DuPont granted 3M a nonexclusive, royalty-free license under any patent issuing from the Rexford application to practice any invention claimed therein which found support in the Lo application. 3M in turn granted DuPont a nonexclusive, royalty-free license under any patent issuing from the Lo application to practice any invention claimed therein which found support in the Rexford application. Under Article III DuPont granted 3M a royalty-free license under Claim 1 of its Benning patent, No. 2,374,581, to make and use HFP, one of the two principal components of Viton A and KEL-F 2140. This extra license to 3M was limited to the making or using of HFP in the amount required by 3M for use in the manufacture of KEL-F 2140. Article IV provided that "No right or license is granted by either party hereto under any claim of any patent or any application of DuPont or Minnesota other than those specifically mentioned above in Articles II and III."

On September 25, 1958, three weeks after the agreement was signed, 3M's attorney, Alexander, wrote DuPont's attorney, Frey, calling attention to the application of Honn and Sims; a copy of the specification contained in the application was enclosed with the letter. On November 10, 1958 Alexander again wrote Frey, saying that he intended to file a motion in the interference to substitute the Honn and Sims application for the Lo application. The letter also read in part, "Minnesota Mining and Manufacturing Company is willing to grant you a license on application S. N. 346,800 [Honn and Sims] although the present settlement agreement does not cover this application." Frey replied to this letter on December 9, 1958, saying in part:

We appreciate your offer to grant us a license under your application Serial No. 346,800 although it is not included in the present settlement agreement. We would be interested in knowing the terms under which you propose to grant us this license. Of course, if the application is finally incorporated in this interference it would actually appear to be a part of it and we feel should be incorporated in the settlement which we have already made.

On December 24, 1958 3M filed a motion in the interference to substitute the Honn and Sims application for the Lo application, but its motion was denied by the patent office. Subsequently, priority over Lo was awarded to Rexford; the Rexford patent issued to DuPont; and, in accordance with the settlement agreement, 3M received a license under the Rexford patent.

3M continued to prosecute its Honn and Sims application and, following a decision by the Court of Customs and Patent Appeals, the patent in suit issued. When negotiations for a separate license to DuPont under this patent failed, the present action was filed.[3]

3M takes the position that the agreement was intended solely to settle an interference; that the contract unambiguously granted licenses only under specified claims of specified patents; and that, contrary to the district court's holding, the agreement was not intended to give the parties "an unencumbered right to continue manufacturing and selling their respective products." 3M makes particular reference to Article IV of the agreement which provides that no license is granted under any patent or application "other than those specifically mentioned" in the agreement. 3M argues that the only purpose of Article IV was to exclude a license under a patent such as that in suit.

DuPont concedes that Article IV on its face appears to exclude the grant of a license from 3M under the Honn and Sims patent, but argues that the doctrine of estoppel prevents a literal ap-

---

3. The Honn and Sims patent contains claims which are allegedly generic in scope, thus dominating the species claim in the Rexford patent.

plication of Article IV to the situation presented in this case. We agree.

Article II of the agreement grants a royalty-free license to "practice any invention" disclosed in the other party's application. Since the parties knew that both Lo and Rexford claimed identical inventions in elastomeric copolymers consisting of HFP and $VF_2$, the language employed in Article II necessarily implies that the parties were granting to each other a license to make their respective products, DuPont's Viton A and 3M's KEL-F 2140, although the license was not limited to these specific products. This implication is buttressed by Article III by which DuPont granted 3M a license under the Benning patent to make and use HFP in amounts necessary to its manufacture of copolymers of HFP and $VF_2$. Obviously, if the agreement was intended, as 3M contends, solely to settle an interference between specific claims of competing applications, there would have been no need for the inclusion of the Benning patent in the agreement.

The circumstances leading to the agreement also show that the parties intended to license the continued making of their products. For example, after a meeting on May 16, 1956 between Dr. Ernest Bridgwater, an official of Du-Pont and Dr. B. F. Oakes, a vice-president of 3M, Dr. Oakes prepared a memorandum concerning the "KEL-F 2140 and 'Viton' A Situation" which read in part:

> Dr. Ernest Bridgwater, head of the Elastomer Division of E. I. duPont de Nemours & Company, visited me today, at which time the possibility of some type of agreement for the manufacture of the above products by each company was discussed. This discussion was primarily directed to a possible interference between our patent application on KEL-F 2140 and a similar duPont application on "Viton" A.

Also, on June 13, 1958, Dr. Oakes wrote Dr. Bridgwater, "I think we agree that now is the time for a meeting to try to settle the above interference in a manner whereby each party would secure some freedom to practice the invention of the interference." The whole tenor of the negotiations preceding the agreement leads to the conclusion that both parties thought they were receiving the royalty-free right to continue manufacturing their respective products.

■■ Applying the policy of fairness underlying the doctrine of estoppel, courts have consistently held that it is inequitable for a licensor of a patent to negate the licensed right by asserting against the licensee a later-acquired dominating patent. Thus, in United Printing Mach. Co. v. Cross Paper Feeder Co., 220 F. 322, 324 (D.Mass.1915), the court said, "A patentee cannot sell his rights to another, and buy or obtain control of an older patent, and, through such older patent, dispossess his assignee of the full benefit of what he purchased," and, as demonstrated in AMP Inc. v. United States, 389 F.2d 448, 452, 182 Ct. Cl. 86, cert. denied, 391 U.S. 964, 88 S. Ct. 2033, 20 L.Ed.2d 878 (1968), no showing of false representation is required:

> This estoppel is actually in the nature of a legal estoppel. The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.

Other cases that have applied the doctrine of estoppel to situations analogous to that in this case are Green v. Aerosol Research Co., 374 F.2d 791 (7th Cir. 1967); National Rubber Mach. Co. v. McNeil Mach. & Eng. Co., 132 F.2d 436 (6th Cir. 1942); and Cold Metal Process Co. v. Republic Steel Corp., 123 F.Supp. 525 (N.D. Ohio 1954), aff'd, 233 F.2d 828 (6th Cir.), cert. denied, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956).

Under the circumstances of this case it would be inequitable to construe Article IV of the settlement agreement .to prevent the application of the doctrine of estoppel. It is inconceivable that DuPont would have agreed to the terms of the agreement as written if it had been aware of the Honn and Sims application and the possibility of its maturing into a dominating patent. Yet 3M knew of this possibility, either actually or constructively, at the time the settlement agreement was signed, but remained silent. Good faith bargaining required 3M to reveal its Honn and Sims application before and not after the agreement was signed. Although Article IV indicates that a narrowly-drawn bargain was contemplated in that neither party wished to give the other more than was specified in Articles II and III, it may not be subverted into a protective shield for the nondisclosure of a material fact that should have been revealed. That 3M attempted to substitute the Honn and Sims application for the Lo application within three weeks after the agreement was signed strongly suggests that during the negotiations 3M deliberately withheld from DuPont its intentions. But such a finding—which the district court did not make—is not necessary for the application of the doctrine of estoppel. Even if 3M did not have this possible substitution in mind before September 5, 1958, it may not now "take away with its left hand that which it had promised to deliver with its right." Cold Metal Process Co. v. Republic Steel Corp., *supra* at 549.

3M argues that the letter from Du-Pont's attorney Frey to 3M's attorney on December 9, 1958 (the pertinent part of which is quoted above) recognized that the agreement did not insure complete freedom from all other patents of the respective parties. We agree. But the letter must be read in context with the surrounding facts, particularly with regard to what Frey knew at the time. When the letter was written, the parent Honn and Sims application neither disclosed nor claimed copolymers of HFP and $VF_2$. All that Frey knew was that the application filed April 3, 1953 described and claimed cross-linking or vulcanizing methods and the vulcanized products thus obtained and that Kellogg's chemists had not worked on copolymers of HFP and $VF_2$ prior to August 1954. That Frey did not have in mind a patent dominating any that might issue to Lo or Rexford is evidenced by his statement, " * * * if the application [Honn and Sims] is finally incorporated in the interference it would actually appear to be a part of it and we feel should be incorporated in the settlement which we have already made." Accordingly, we do not interpret this letter as constituting an admission by DuPont that the Honn and Sims application was not included in the settlement agreement.

In summary, we believe that on the basis of undisputed evidence the agreement was negotiated and executed with the view that each party would have, as the district court ruled, the right to make its respective product. In light of that purpose, it is apparent that the parties intended by Article IV to prevent their agreement's being construed to grant implied licenses under peripheral or collateral patents; but they did not intend that Article IV should detract from the essential rights granted by the agreement. Innate fairness requires a holding that 3M is estopped to assert its allegedly dominant patent, the application for which was not disclosed during the settlement negotiations.

The judgment for the defendant is affirmed.