LEVER BROTHERS
COMPANY, Plaintiff,

v.

The PROCTER & GAMBLE DISTRIB-
UTING COMPANY, Defendant.

The PROCTER & GAMBLE
COMPANY, Plaintiff,

v.

LEVER BROTHERS
COMPANY, Defendant,

J.L. Prescott Company,
Defendant-Intervenor.

Civ. A. Nos. 84–4188 (AJL),
85–2501 (AJL).

United States District Court,
D. New Jersey.

Sept. 8, 1987.

Berj A. Terzian, Pennie & Edmonds, New York City, David M. McCann, Carpenter,

Bennett & Morrissey, Newark, N.J., for Lever Bros. Co. and J.L. Prescott Co.

Jerome G. Lee, Morgan & Finnegan, New York City, Frank L. Bate, Shanley & Fisher, P.C., Morristown, N.J., for Procter & Gamble Co.

LECHNER, District Judge.

This consolidated action involves cross-claims for patent infringement brought by the makers and/or distributors of the products "Bounce" and "Snuggle." Bounce and Snuggle are the small sheets used in automatic clothes dryers to reduce the static, and to enhance the fluffiness, of dried laundry. The parties refer to their products as "fabric softeners." Jurisdiction over this action is asserted by way of 28 U.S.C. § 1338(a). Venue in the District of New Jersey is asserted under 28 U.S.C. § 1400 (b).

### I. *Parties and Procedural History*

The Lever Brothers Company ("Lever") commenced this action on October 9, 1984 by filing its complaint against The Procter & Gamble Company[1] and The Procter & Gamble Distributing Company ("P & G"). Lever is a Maine corporation with its principal place of business in New York, New York, and does substantial business in New Jersey. Lever markets and sells the dryer-added fabric softening product, Snuggle. P & G is an Ohio corporation with its principal place of business in Cincinnati. P & G apparently manufactures, as well as markets and sells, the dryer-added fabric softening product, Bounce.

P & G commenced an action against Lever by complaint filed May 24, 1985.[2] By order, filed September 30, 1985, a motion brought by J.L. Prescott Company ("Prescott") for leave to intervene as a defendant in the second action was granted. Apparently, Prescott manufactures dryer-added fabric softening products for

sale to companies which market, distribute and sell such products to the general public. It seems Lever is Prescott's largest customer for dryer-added fabric softener products. I shall refer to Lever and Prescott collectively as "Lever/Prescott."

These actions were originally assigned to another judge and were consolidated for all purposes on October 4, 1985. By notice of motion, filed November 26, 1985, Lever/Prescott brought the instant motion seeking summary judgment on P & G's claim against Lever/Prescott. In this motion Lever/Prescott assert (1) P & G's two allegedly infringed patents do not cover Lever/Prescott's Snuggle product; (2) even if the patents do cover Snuggle, P & G granted Lever/Prescott an implied license to use the allegedly infringed patent; and (3) P & G is barred by the doctrines of estoppel and laches from asserting the alleged infringement. The judge to whom these actions were originally assigned entertained oral argument on the motion on March 10, 1986 and reserved decision. By order, filed July 29, 1986, these matters were transferred to me.

I was unaware that the case had been transferred to me with a decision reserved on the pending summary judgment motion. The parties apprised me of the fact at a status conference held in late October, 1986. The parties reargued the motion before me on February 13, 1987. I filed an opinion deciding the motion on February 26, 1987. The parties have submitted briefs on a motion for reargument filed by Lever/Prescott. This amended opinion supersedes my original opinion and addresses certain issues raised in the reargument submissions.

### II. *Factual Background*[3]

Prior to 1965, clothes softening products were developed for use in the washing machine. Added during the rinse cycle of the

---

1. The Procter & Gamble Company was dismissed from the action commenced by Lever by Stipulation and Order, filed March 18, 1985.

2. The plaintiff is The Procter & Gamble Company. I refer to the Procter & Gamble companies generally as "P & G."

3. Because this motion involves only P & G's infringement claim against Lever/Prescott, I discuss only the facts relevant to that claim.

washing process, these products were designed to enhance the feel and smell of freshly laundered clothes, reduce knotting and wrinkling of clothes and render the clothes static-free. Although these washer-added softeners basically achieved their intended purposes, they apparently had several drawbacks: they did not react well with standard clothes washing detergents; they required additional work on the part of the person washing the clothes; and, to be effective, they had to be used in relatively large amounts. (*See* Rzucidlo Decl., 1/2/86, Ex. D, at col. 1.) To address these drawbacks, inventors began to develop dryer-added softener products.

### A. *Patents at Issue*

Four patented inventions, developed by three different inventors, are relevant to this motion. All four patents are now and, at all relevant times, have been owned by P & G. Two of the patents originally obtained by Messrs. Gaiser and McQueary are not directly at issue in this motion and need not be described in depth. The two patents obtained by an inventor named Morton are the primary focus of this summary judgment motion.

### 1. *Gaiser Patent*

On August 13, 1965, Conrad Gaiser, an independent researcher, filed an application for a patent on his invention for a dryer-added softening product. The product was designed to overcome the drawbacks associated with washer-added softeners. The abstract of Gaiser's patent states: "Fabrics are conditioned by commingling the same in a laundry dryer by tumbling them together with a flexible substrate carrying a softening or other modifying agent whereby the agent is transferred to the fabrics." (Rzucidlo Decl., 1/2/86, Ex. D, at col. 1.) The discussion of the invention indicates that the preferred form of substrate sheet —i.e. the sheet upon and in which the chemical softeners are carried—is "in the form of cellulosic sheet material" such as paper toweling or flannel. (*Id.* at col. 2, 1.

25.) The discussion further sets forth several preferred fabric conditioners, but notes "it is immaterial what the conditioning agent is as long as it is substantive to the fabric upon which it is deposited, and will vaporize under the flow of drying air and steam generated from the washed fabric as it is being dried." (*Id.* at col. 3, 1. 62–66.) The discussion also notes that roughly one to ten grams of fabric conditioner carried in a sheet of approximately 105 square inches of paper toweling is sufficient to be effective. (*Id.* at cols. 3–4.)

Although the above-cited references in the discussion section of Gaiser's patent are somewhat specific, the actual claims awarded to Gaiser are not.[4] The eight claims asserted by Gaiser are all related to the first which claims: "The method of conditioning fabrics which comprises commingling pieces of damp fabric by tumbling said pieces under heat in a laundry dryer together with a flexible substrate carrying a conditioning agent to effect transfer of the conditioning agent to the fabric while being dried." (*Id.* at col. 5, 1. 20–25.) Claims four through six assert the method of claim one where the agent is a softening, antistatic and bacteriostatic agent.

The patent was awarded to Gaiser on May 6, 1969. Although the record indicates P & G now owns the Gaiser patent, it is unclear exactly when P & G acquired it. The patent was first commercialized under license to the Purex Corp., Ltd., which utilized the invention in its "Tumblepuffs" product. (Rzudiclo Decl., 1/2/86, Ex. A, FW 65–76.)

### 2. *Morton Patents*

At some point prior to December, 1968, a P & G employee named Morton began to study the Tumblepuffs product and to investigate the possibility of improving it. Apparently, at this point in time, P & G had not yet acquired the rights to the Gaiser patent. Morton apparently discovered that although the Tumblepuffs product achieved

---

**4.** According to federal statute, a patent application must include a specification which "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

its basic purposes, it occasionally caused unsightly staining of the clothes with which it was tumbled. Morton determined the staining occurred because the substrate sheet used in Tumblepuffs was not sufficiently absorbent to prevent excessive chemical softening agents from being transferred to the tumbling clothes: "The prior art has failed to recognize the importance of controlling release of softener from the substrate by controlling the absorbency of the material used as a substrate." (Rzucidlo Decl., 1/2/86, Ex. A, FW 3.) To address the problem, Morton developed the idea of using a more absorbent substrate sheet than had been used under the Gaiser patent, upon which the chemical softeners were coated or impregnated.

On December 30, 1968, an application was filed on Morton's behalf for a patent on his invention, setting forth seventeen claims. Because the Patent Office determined the application actually set forth grounds for two distinct inventions, the application was eventually treated as two applications. (*Id.*, FW 101.) Claims one through sixteen of Morton's original application were treated as one application and eventually resulted in the issuance of United States patent number 3,686,025 (the "'025 patent"). These claims involved an invention for an improved "process[ ] for coating of felt or fibrous materials." (Rzucidlo Decl., 1/2/86, ¶ 8.) Claim seventeen of Morton's application was not pursued until after issuance of the '025 patent. It resulted in the issuance of United States patent number 3,843,395 (the "'395 patent"), for an improved "coating process[ ] which involve[s] tumbling during the coating process." (*Id.*) Because infringement of the Morton patents is the subject matter of this motion, the prosecution history—i.e.

the actions taken, and the arguments made, by counsel for Morton and officials of the Patent Office during prosecution of the patent—must be assessed in some detail.[5]

#### a. *'025 Patent Prosecution*

As originally filed on December 30, 1968, the '025 patent application was approximately sixty pages long. It was divided into sections headed "Background of the Invention," "Detailed Description of the Invention," "Brief Summary of the Invention" and "Examples" and concluded with a section setting forth the specific claims of the invention. The "Background of the Invention" section indicated a primary aim of the claimed invention was to address the staining problem associated with Tumblepuffs: "[I]t is an object of this invention to provide a novel fabric softening composition which can be used in a standard automatic clothes dryer and which eliminates or substantially reduces fabric staining." ('025 FW at 3.) That this object of the invention was of singular importance in the patent application is reinforced by the fact that the first seven pages of the "Detailed Description of the Invention" section of the application were devoted to a fairly technical description of the absorbent substrate.

The focus of the application then shifted markedly to a seemingly detailed, and highly technical, description of the particular chemical composition of the preferred softening agents to be impregnated into the substrate sheets. Approximately twenty pages of the application, much of it indecipherable to a non-chemist,[6] set forth detailed descriptions of the particular fabric softeners suggested for use in the ultimate product. Relevant to this motion is the

---

5. Both parties have submitted copies of the two patents' file wrappers—i.e. the written records submitted to and by the Patent Office during prosecution of the patents. (Rzucidlo Decl., 1/2/86, Exs. A, B; Lever/Prescott Exs. I, J.) Citations to specific pages of these file wrappers will be made to "'025 FW at ___" and "'395 FW at ___."

6. For example, in describing preferable fabric softeners, the application recommended: "Other

anionic sulfonates useful as softening agents herein are the synthetic detergents as represented by, among others, sodium or potassium alkylbenzenesulfonates and sodium alkylglycerylethersulfonates having the configuration of figure (9) above [figure (9) represents what appears to be a remarkably complex chemical equation], wherein $R_{21}$ is an alkylbenzene or alkylglycerylether with the alkyl containing from 10 to 20 carbon atoms." ('025 FW at 30.)

application's initial disclosure, as particular fabric softeners, of the class of compounds called "cationic quaternary ammonium salts including quaternary imidazolinium salts." ('025 FW at 12–13.) The application went on to specify these agents in greater detail: "Specific examples of the particularly preferred cationic softening agents include ... ditallow dimethyl ammonium chloride, [and] ditallow dimethyl ammonium methyl sulfate." ('025 FW at 16.) According to the application, these softeners are particularly efficacious at softening laundry.

Another four or five pages of the application described in detail the particulars of combining the substrate and the softeners. The application specified that the chemical softeners be "impregnated" into, rather than coated upon, the substrate sheet. Moreover, the application specified a preferred weight ratio of chemical softener to substrate:

> In applying the softening agent to the absorbent substrate, the amount of softener impregnated into the absorbent substrate is in the ratio range of 10:1 to 2:1 by weight of the dry untreated substrate. Preferably, the amount of the softening agent impregnated is from about 4:1 to about 2:1, particularly 3:1, by weight of the dry untreated substrate. When the softening agent is a condensation product of fatty alcohol with 1 to 45 moles of ethylene oxide, the ratio of softener to substrate is preferably from 3:1 to 2:1 by weight of the dry substrate to insure optimum non-staining characteristics.

('025 FW at 36.) The application proceeded to describe fifteen specific examples of possible combinations of substrates and softeners, and processes for combining them, apparently to demonstrate the novelty of the invention.

The final five pages of the application set forth the seventeen specific claims originally sought by Morton. For purposes of the motion before the court with respect to the '025 patent claim,[7] the only relevant claim is the first:

> 1. A fabric softening composition consisting essentially of a fabric softener impregnated into an absorbent substrate having an absorbent capacity of from 5.5 to 12, wherein said fabric softener has a softening point of from 100° F to 170° F and the weight ratio of fabric softener to the dry substrate ranges from 10:1 to 2:1.

('025 FW at 56.) Because the claim specified only "a fabric softener," it literally encompassed all softeners, including the cationic quaternary ammonium compounds, ditallow dimethyl ammonium methyl sulfate ("DDAMS") and dialkyl dimethyl ammonium chloride ("DDAC"). Claims two through sixteen were narrower in scope than claim one, and covered various specifications of the substrate sheets and encompassed specific compositions of fabric softener compounds.

In a communication comprising a one page form and five pages of explanation, dated October 2, 1970, the Patent Office rejected all of the claims in Morton's application. Among the reasons given for rejection of the first and pivotal claim were: (1) the claim was "too broad and indefinite in the recital of the absorbent substrate" ('025 FW at 79); (2) the claim was "too broad in the recital of the fabric softener" (id.); and (3) the claim was "unpatentable" in light of the Gaiser patent and other similar patents for comparable inventions ('025 FW at 80–82).

An amendment to the original application was filed on December 29, 1970, after Morton's attorney had met with the patent examiner. Most importantly, claim one was amended to read as follows:

> Claim 1 (AMENDED). A fabric softening composition consisting essentially of a fabric softener impregnated into an absorbent substrate having an absorbent capacity of from 5.5 to 12 [, wherein]; said fabric softener [has] having a softening point of from 100° F to 170°

---

7. The seventeenth claim is relevant for purposes of the '395 patent prosecution history and is discussed, infra.

F and being selected from the group consisting of cationic quaternary ammonium and imidazolinium salts and zwitterionic quaternary ammonium compounds; said absorbent substrate being selected from the group consisting of multiply paper and non-woven cloth; and the weight ratio of fabric softener to the dry substrate [ranges] ranging from 10:1 to 2:1.

('025 FW at 86 (deletions bracketed, additions underlined).) In his remarks accompanying the claim amendments, Morton's patent attorney suggested that the class of specified fabric softeners set forth in amended claim one was not too broad in light of existing patents. The chemical compounds contained in the amended claim one continued to encompass both DDAC and DDAMS. Other claims were amended or added to describe more specifically certain aspects of the substrate sheet and to suggest other specific combinations of fabric softeners. Morton's attorney argued the amended claims were not "obvious" under the Gaiser patent because they, unlike those set forth in the Gaiser patent, specified certain fabric softening compositions, specified the absorbent capacity and composition of the substrate sheet and specified the particular weight ratio of fabric softener to substrate. ('025 FW at 93.)

On April 19, 1971, again in a communication comprising a one page form and a five page discussion, the patent examiner rejected the amended application on several grounds. Although the grounds for the rejection are not spelled out at length, it appears the patent examiner was concerned, in light of existing patents, with the composition of the claimed fabric softeners: "[The pre-existing Scheuer patent] discloses quaternary ammonium compounds within the scope of the softener herein impregnated on an absorbent multiply paper which would inherently have an absorbency within the present claimed range." ('025 FW at 102–03.) In addition, the patent examiner was concerned with the obviousness of the claimed substrates under the Gaiser patent: "Gaiser's generic

teaching of textile fabrics and absorbent paper substrates is inclusive of the non-woven fabrics and multi-ply paper products claimed herein. The teaching of Gaiser of paper towels, sponges, and flannel and felted fabrics is obviously suggestive of highly absorbent substrates as claimed herein." ('025 FW at 103.)

The claim was again amended in a filing dated August 16, 1971. The amendment did not change claim one's specifications for the particular fabric softeners to be used. The amendment did change, through extensive specifications, the claim as to the substrate sheet. ('025 FW at 109–10.) In an accompanying nine pages of "Remarks," Morton's attorney argued for patentability. On October 29, 1971, in a one page form and one page discussion, the patent examiner "finally" rejected the application as unpatentable under the Lerner [8] and Gaiser patents. The examiner was unconvinced by Morton's attorney's arguments that the particular fabric softeners disclosed in Morton's application were not already covered by existing patents: "The Lerner patent discloses quaternary ammonium compounds within the scope of the softeners claimed herein...." ('025 FW at 126.) The examiner was further unpersuaded the application's claims covering the specific substrate sheets were not already covered by patents. (*Id.*)

Apparently, in the realm of patent applications, final is not final. On January 31, 1972, Morton's attorney filed a response to the final rejection in which he urged the patent examiner to reconsider this final rejection. ('025 FW at 129.) Before the request for reconsideration was considered, however, Morton's attorney filed a supplemental response to the final rejection on February 23, 1972. ('025 FW at 139.) This supplemental response made specific amendments to the claims which had been contained in the August 16, 1971 amended filing, and "finally" rejected on October 29, 1971. In particular, the first claim of the August 16, 1971 amended filing, insofar as it covered specific fabric softeners, was further amended to claim:

8. The substance of the pre-existing Lerner patent is not at issue in this case.

A fabric softening composition consisting essentially of a fabric softener impregnated into an absorbent substrate having an absorbent capacity of from 5.5 to 12; said fabric softener having a softening point of from 100° F. to 170° F. and being selected from the group consisting of <u>dialkyl dimethyl ammonium chlorides where the alkyl has from 12 to 20 carbon atoms; tallowdimethyl (3–tallowalkoxypropyl) ammonium chloride;</u> cationic [quaternary ammonium and] imidazolinium salts and zwitterionic quaternary ammonium compounds....

('025 FW at 139 (deletions bracketed, additions underlined).) In addition, the first claim of the August 16, 1971 amended filing was significantly amended by the February 23, 1972 supplemental response as to its coverage of substrate sheets so as to drop any claim to a substrate made from paper. The claim continued to retain the 10:1 to 2:1 specification for the weight ratio of fabric softeners to substrate. ('025 FW at 139–40.) As explained in Morton's attorney's remarks, the amendment "sharpens the description of one of applicant's fabric softening agents as a dialkyl dimethyl ammonium chloride...." ('025 FW at 141.)

For purposes of this motion, the important amendments in the claim are those describing the claimed fabric softeners. The only fabric softeners deleted in the amended claim were those in the class of fabric softeners consisting of "cationic quaternary ammonium compounds." P & G has admitted in response to Lever/Prescott's first request for admissions, that DDAMS is a cationic quaternary ammonium compound. (Lever/Prescott, Ex. E at 3.) Thus, DDAMS is a member of a class of fabric softener compounds expressly withdrawn from the claims of the '025 patent.

The only fabric softeners expressly added in the amended claim were the compounds, "dialkyl dimethyl ammonium chlorides where the alkyl has from 12 to 20 carbon atoms" and "tallowdimethyl (3–tallowalkoxypropyl) ammonium chloride." P

& G has admitted in response to Lever/Prescott's first request for admissions, that DDAMS is not tallowdimethyl ammonium chloride, a cationic imidazolinium salt or a zwitterionic quaternary ammonium compound. (Lever/Prescott, Ex. E. at 2.) P & G has also admitted DDAMS is not literally an ammonium chloride. However, P & G asserts DDAMS is an "equivalent" of DDAC. (Lever/Prescott, Ex. E. at 1.)

On March 1, 1972, the patent examiner issued a one page form indicating the Morton claims [9] would be allowed "in view of" (1) the February 23, 1972 amendments to the claims and (2) a telephone interview with Morton's attorney on February 24, 1972. ('025 FW at 143.)

### b. '395 Patent Prosecution

On August 21, 1972, Morton's attorney refiled the original '025 patent application in its entirety so that original claim number seventeen could be prosecuted independently for a patent on an improved method for softening fabrics in an automatic clothes dryer. On December 4, 1973, Morton's attorney amended the application to drop the first sixteen claims of the original '025 patent application and expand the seventeenth claim. Expanded to eleven claims (numbered seventeen through twenty-seven), the prosecution history of the '395 patent application's seventeenth and eighteenth claims are at issue in this motion.

Claim seventeen originally asserted the process whereby a substrate with an absorbent capacity of from 5.5 to 12 is impregnated with a fabric softener with a "softening point" between 100° F and 170° F. The weight ratio of fabric softener to dry substrate was specified to range between 10:1 to 2:1. The claim specified that the impregnated substrate sheet be tumbled with clothes in a dryer at a temperature between 75° F and 170° F to effectuate the fabric softening process. ('395 FW at 67.)

Claim eighteen asserted the process described in claim seventeen wherein the fab-

---

9. As noted, *supra*, the February 23, 1972 submission was a supplemental response to the January 31, 1972 response to the examiner's "final" rejection, dated October 29, 1971.

ric softeners are selected from among various enumerated groups of fabric softeners. One of the specified groups was cationic quaternary ammonium compounds, the group admitted by both parties to contain DDAMS. Another group of fabric softeners specified in claim eighteen included "nonionic compounds selected from the group consisting of ... ethoxylated aliphatic alcohols." ('395 FW at 67.) Although the parties are agreed that the fabric softener, polyethyleneglycol monosteorate containing four to five moles of ethylene oxide per mole of stearic acid ("PEGS"), is not literally covered by many of the groups specified in claim eighteen, there appears to be some question whether PEGS is an ethoxylated aliphatic alcohol as covered by claim eighteen of the patent application. P & G claims PEGS is a "derivative" and an equivalent of this group. (Lever/Prescott, Ex. E at 5.)

The remaining nine claims in the '395 application set forth various specifications for the substrate sheet and specific designations of fabric softeners.

The amended claims were summarily rejected by the patent examiner on January 7, 1984:

> Claims 17-27 are rejected under 35 U.S.C. 103 as unpatentable as merely defining an obvious method in view of Gaiser. The claimed process for softening fabric in an automatic clothes dryer is an obvious method method [sic] as evidence [sic] by the disclosure in Gaiser. These claims do not define the fabric softeners as they are defined in the claims of Patent No. 3,686,025. The fabric softeners should be defined as they are defined in the claims of the patent.

('395 FW at 82.) In response, Morton's attorney filed an amended application on March 1, 1974, simply combining claims seventeen and eighteen. ('395 FW at 95–97.) Curiously, and contrary to the patent examiner's instruction in his notice of rejection, the amendment did not define the specified fabric softeners as they had been defined in the '025 patent. Nonetheless, on April 12, 1974, the patent examiner allowed the amended claims (numbered seventeen

and nineteen through twenty-seven) as patentable. ('395 FW at 106.)

### 3. *McQueary Patents*

The McQueary patents are only tangentially relevant to this case and may be discussed briefly. McQueary's inventions were designed to obviate the problem arising when dryer-added fabric softener sheets blocked the dryer's air vent. Prior to the McQueary inventions, when a fabric softener sheet blocked the dryer's vent, hot air could not escape from the dryer and the dryer would overheat and shut off. The McQueary inventions call for putting slits or perforations in the sheets, or otherwise assuring the sheets meet specifications to "permit at least about 75% of the normal volume of air flow" through the sheet in the event the sheet blocks the dryer's air vent. (Feiler Aff., 1/17/86, Ex. C. at 1.) Four related McQueary patents are owned by P & G.

### B. *Business Dealings in the Patents*

In July, 1976, counsel for Prescott communicated with P & G for the purpose of obtaining for Prescott a license to use the Gaiser patent. Apparently P & G decides whether to grant licenses to use patents it owns on a patent by patent basis. Prior to July, 1976, P & G had determined to license the Gaiser patent. (Witte Aff., 1/14/86, ¶¶ 2, 3.) In an agreement, dated August 18, 1976, (the "Gaiser License Agreement"), P & G agreed to license the use of the Gaiser patent to Prescott in return for a $25,000.00 deposit and a 2% royalty payment on the net sales value of licensed goods sold by Prescott in the United States. Paragraph nine of the Gaiser License Agreement provides: "No PROCTER know-how and/or PROCTER patents, either foreign or domestic, are included within the scope of this Agreement except for Licensed Patent [the Gaiser patent]." (Witte Aff., 1/14/86, Ex. C at 5.)

In October, 1976, Prescott submitted to P & G a variety of samples of the product it intended to manufacture and sell under the

Gaiser license.[10] According to the affidavit of Edward V. Tinebra, a Prescott vice president, the samples submitted to P & G consisted of nonwoven rayon sheets impregnated with a fabric softener composition made up of 87.2% DDAMS, 10.8% sorbitan monostearate and 2% perfume. Some of the sheets had slits to allow air to flow through them; others did not. The sheets had a fabric softener to substrate sheet weight ratio of 1.92:1. (Tinebra Aff., 11/25/85, ¶ 8; Lever/Prescott Ex. D.)

P & G employees apparently performed some tests on the sample sheets submitted by Prescott. The affidavits submitted by Tinebra and Gordon F. Brunner, a P & G vice president, indicate the sheets were tested only for airflow capability. (Tinebra Aff., 11/25/85, ¶¶ 9, 10; Brunner Aff., 1/16/86, ¶ 5.) The record does not indicate the sheets were tested to determine the composition of their fabric softener compounds. After the airflow tests had been conducted, P & G officials informed the Prescott representative that the samples probably infringed the McQueary patents. Following some negotiation and correspondence between the parties, on December 29, 1976, P & G and Prescott entered into a second licensing agreement (the "McQueary Licensing Agreement"), whereby Prescott obtained a license to produce dryer-added fabric softening sheets "sufficiently porous to permit at least seventy-five percent (75%) of the normal volume of air to flow through...." (Witte Aff., 1/14/86, Ex. K, ¶ 1(c).) The McQueary Licensing Agreement provided that Prescott would pay an additional 1% "running" royalty on Prescott's sale of the licensed product.

During this negotiation period, at least one Prescott official was aware of the Morton patents, but was unconcerned with infringing upon them because he believed the specific product Prescott intended to manufacture was not covered by the Morton patents. The Prescott employee understood the '025 prosecution history to have removed DDAMS and other cationic qua-

ternary ammonium compounds from the scope of the claim, and understood both of the Morton patents to cover fabric softener sheets only if the sheets were manufactured with a substrate-to-softener weight ratio in excess of 2.0:1. (Tinebra Aff., 11/25/85, ¶ 13.) Furthermore, a Lever employee indicates he had reached a similar conclusion from a review of the Morton patents. (Hockey Aff., 11/19/85, ¶ 25.) During the negotiations neither party raised the issue of potential infringement under the Morton patents. The parties disagree whether, in light of the absence of discussion about the Morton patents, Prescott was "given to understand that the J.L. Prescott Company had all of the consents and permissions needed from P & G under its patents to go forward with" production of Prescott's product. (Prescott Aff., 11/25/85, ¶ 11; Tinebra Aff., 11/25/85, ¶¶ 9, 13; Brunner Aff., 1/16/86, ¶¶ 8(c), 9.)

In March, 1977, Prescott began manufacturing its fabric softening sheets for resale to its customers for distribution to the public. These sheets were identical to the samples which had been submitted to P & G for inspection in October, 1976. Prescott invested close to $1,000,000.00 in "start up capital" to enter into the dryer-added fabric softener business. In June, 1984, after another $1,000,000.00 capital investment to expand, Prescott began providing its product to Lever for resale under the Snuggle name. Lever invested approximately $10,000,000.00 to develop, test and promote Snuggle to larger segments of the United States market. Lever has become Prescott's largest customer for dryer-added fabric softener sheets. In all, Prescott claims to have paid royalties in excess of $2,400,000.00 to P & G under the Gaiser and McQueary Licensing Agreements. (Tinebra Aff., 11/25/85, ¶¶ 14–21; Cookson Aff., 11/25/85, ¶¶ 4–6.)

According to Prescott's vice president, Tinebra, the Prescott product has not changed substantially since the samples were submitted to P & G in October, 1976. One of the product's fabric softeners has

10. Prescott's chairman has indicated his purpose in submitting the samples to P & G was to ensure P & G would not object to slits in the substrate sheet. (Prescott Aff., 11/25/85, ¶ 4.)

always been DDAMS. The other fabric softener has always been one of three products and, since July, 1979, has been PEGS. The specifications for the weight ratio of the fabric softeners to the dry substrate provided to the plants actually manufacturing the sheets, have apparently called for a weight ratio of not greater than 1.92:1. (Tinebra Aff., 11/25/85, ¶¶ 16, 17; Ex. D.) However, Tinebra admits that up to "7/10ths of 1% of all of the commercial Snuggle rolls manufactured for Lever by Prescott have had a weight ratio of DDAMS plus PEGS to dry substrate above 2.0:1 due to random manufacturing variations." (*Id.*, ¶ 19.) Tinebra asserts that since April 13, 1984, the Prescott product distributed by Lever as Snuggle has been composed of 69.8% DDAMS, 27.1% PEGS, 3% perfume and 0.1% optical brightener. (*Id.*, ¶ 18.) These figures, Lever/Prescott contend, constitute a 1.54:1 weight ratio of fabric softener to substrate for the Snuggle product. (Lever/Prescott Ex. D. at p. 3.)

### C.  *Positions on this Motion*

The respective positions taken by the parties on this motion for summary judgment are not complicated. Lever/Prescott first argue the product Snuggle does not infringe upon the '025 patent because the fabric softeners used in Snuggle are not included among those disclosed in the '025 patent. Anticipating P & G's argument under the patent law doctrine of equivalency—that is, that the Snuggle fabric softeners are the functional equivalent of those disclosed in the patent and are thus covered by it—Lever/Prescott argue P & G is barred from asserting equivalency by the doctrine of prosecution history estoppel. Prosecution history estoppel refers to the idea, perhaps simple conceptually but rather more difficult in its application, that a patent applicant who specifically narrows his claim during the application's review before the patent office, will be barred from later asserting infringement against that aspect of his claim which was deleted by the amendment. Lever/Prescott assert Morton narrowed his claims during prosecution of the '025 patent to exclude specifically the group of compounds including

DDAMS from the fabric softeners covered by the patent.

Lever/Prescott advance a similar argument asserting Snuggle does not infringe the '395 patent. Lever/Prescott concede DDAMS is literally covered by the fabric softeners claimed in the '395 patent, but argue PEGS is not covered. Again, Lever/Prescott argue P & G is barred by prosecution history estoppel from claiming PEGS, as a fabric softener equivalent to those literally covered by the '395 patent, is covered by the '395 patent.

Lever/Prescott also argue Snuggle does not infringe either the '025 or '395 patent because the specified weight ratio of fabric softener to substrate in Snuggle is less than the 10:1 to 2:1 range of weight ratios specified in those patents. Lever/Prescott assert the weight ratio specification pursuant to which Prescott's factories manufacture dryer-added fabric softener products has never exceeded 1.92:1, and that the weight ratio specification for the Snuggle product has in fact never exceeded 1.54:1.

Beyond the issue of patent infringement, Lever/Prescott argue P & G's conduct in its business dealings with Prescott should bar P & G from asserting infringement against Lever/Prescott. Lever/Prescott assert that because P & G never suggested to Prescott that it would need to obtain a license under the Morton patents, despite P & G's knowledge of the nature of Prescott's product and Prescott's intentions with respect to that product, P & G should be deemed to have granted an implied license of the Morton patents to Prescott.

In addition, Lever/Prescott urge that because P & G was allegedly aware from the outset of the P & G–Prescott relationship that Prescott and Prescott's customers would expend significant amounts of money on development and production of fabric softener products with the understanding P & G had acquiesced in such activity, P & G should be estopped from now claiming infringement of the Morton patents. Finally, Lever/Prescott argue that because Prescott's product is essentially unchanged from the product it submitted to P & G over eight years before this action was

934

commenced, P & G should be barred under the doctrine of laches from now claiming the Lever/Prescott product infringes the Morton patents.

In opposition to Lever/Prescott's motion, P & G argues the prosecution history of the Morton patents cannot be interpreted, in this motion for summary judgment, to exclude the softeners contained in Snuggle from being found to be within the scope of the fabric softeners set forth in the Morton patents. P & G contends that because the Snuggle fabric softeners are at least equivalent to those specified in the patented Morton claims, the Snuggle product does indeed infringe on the Morton patents. As for the fabric softener-to-substrate weight ratio argument, P & G asserts the Lever/Prescott position is too "wooden" to be upheld. P & G argues the court should not read the Morton patents' weight ratio specifications literally; rather, the court should consider the 2.0:1 and 1.92:1 or 1.54:1 ratios as functional equivalents. In any event, P & G argues, Lever/Prescott have admitted that Snuggle sheets occasionally exceed the 2.0:1 weight ratio specification in the two Morton patents.

P & G further argues the doctrines of implied license, estoppel and laches are improperly asserted by Lever/Prescott. P & G contends it engaged in no conduct by which Lever/Prescott might have been induced into a reasonable belief that P & G would not vigorously seek to protect its non-licensed patents from infringement. Moreover, P & G argues, it acted expeditiously to protect its Morton patents from the alleged infringement occasioned by the Snuggle product. On each of these points P & G submits there exists at least an issue of genuine fact sufficient to preclude summary judgment in Lever/Prescott's favor.

III. *Discussion*

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The district court's task in deciding the motion is to determine whether "there are any genuine factual issues that properly can be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986.)

Although the summary judgment hurdle is a difficult one to meet, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The Court elaborated in *Anderson v. Liberty Lobby*, 106 S.Ct. at 2511 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

## A. Infringement

The primary focus of this summary judgment motion is whether Lever/Prescott's Snuggle product infringes upon the '025 and '395 patents. The infringement question, in turn, depends primarily on the prosecution history of the two patents.[11] Although the principle behind prosecution history estoppel is straightforward, the principle is not so readily susceptible to generalizations easily applied in any given case. Rather, application of the doctrine appears to depend largely on the particular facts of the case.

One commentator has described the doctrine of prosecution history estoppel, traditionally known as file wrapper estoppel, as follows:

The doctrine of file wrapper estoppel precludes a patent owner in an infringement suit from obtaining a construction of a claim that would in effect resurrect subject matter surrendered during the course of proceedings in the Patent and Trademark office. The estoppel applies most frequently where an applicant amends or cancels claims rejected by the Office as unpatentable in light of the prior art.

4 Chisum, *Patents* § 18.05 at p. 18–55 (1986) (footnote omitted). It appears many, if not most, patent applications are amended in one way or another, and such amendments may be less than precise. Thus, the determination whether a particular element of a claim was amended out of the patent's application may be questionable.

In *Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed.Cir.1983), the Court suggested many district courts were applying the doctrine of prosecution history estoppel too liberally. The Federal Circuit noted that because of the prevalence of claim amendments in patent prosecutions, an overly "wooden application" of the estoppel doctrine would tend to undermine the doctrine of equivalents. The equivalents doctrine serves to protect patent holders who, naturally, cannot anticipate all possible equivalent substitute components of their inventions. An overzealous application of prosecution history estoppel, therefore, is potentially at odds with the underlying purposes of the patent laws. As the court pointed out:

Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero.

*Id.* at 1363. Clearly the *Hughes Aircraft* court was concerned that prosecution history estoppel not be applied automatically; the court indicated a court confronting a prosecution history estoppel question must carefully assess the "nature and purpose" of a particular patent claim amendment.

The Federal Circuit, however, has also demonstrated no hesitancy in applying the estoppel doctrine when circumstances warrant. In *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581 (Fed.Cir. 1984), the Court upheld a district court's entry of summary judgment that a patent owner was estopped from asserting an equivalent of its patented claim against an alleged infringer. The patent holder attempted to argue the limiting amendment it had filed with the patent examiner had been unnecessary to obtain the patent. The Court rejected the argument and affirmed the district court's summary judgment application of prosecution history estoppel:

[W]e decline ... to undertake the "speculative inquiry" as to the necessity of the claim limitation in receiving a patent

---

11. Lever/Prescott have conceded, for purposes of this motion, that DDAMS and PEGS, as fabric softeners, are equivalent to the fabric softeners claimed in P & G's Morton patents. (Lever/Prescott Reply Brief at 2.)

Lever/Prescott's primary argument on the infringement issue, therefore, is whether the patents' respective prosecution histories estop P & G from asserting infringement.

grant.... [Plaintiff] is *estopped* from now broadening the description of a claim element limited during prosecution so as to encompass a structure which a competitor should reasonably be entitled to believe is not within the legal boundaries of the patent claims in suit.

*Id.* at 1583 (citations omitted, emphasis in original). *See also, Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.,* 793 F.2d 1279, 1282–85 (Fed.Cir.1986).

The Court of Appeals in *Prodyne* cited its decision in *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 389 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), in which the district court's application of prosecution history estoppel was upheld. In *Kinzenbaw,* the court found the patent owner had amended its patent application to avoid the patent examiner's claim rejection. The Federal Circuit noted the patent owner had shown "no convincing reason" why a competitor would not be justified in assuming he would not infringe the patent if he built the item in question in the manner in which the claim had been amended. Thus, the Federal Circuit has suggested a legitimate line of inquiry for a court faced with an assertion of prosecution history estoppel is to consider the reasonable expectations of competitors reviewing the prosecution history of a patent application.

The cases do not, therefore, provide guidelines of general applicability for deciding prosecution history estoppel questions. Rather, the cases suggest, as the Federal Circuit has summed up: "[A]pplication of prosecution history estoppel to limit the doctrine of equivalents should be performed as a legal matter on a case-by-case basis, guided by equitable and public policy principles underlying the doctrines involved and by the facts of the particular case." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 871 n. 7 (Fed.Cir.1985). From this perspective, I address the two patent prosecutions at issue.

### 1. *'025 Patent*

The issue of whether the '025 prosecution history establishes that the fabric soft-

ener DDAMS cannot be encompassed by the '025 patent boils down to whether there is a reasonable dispute of fact as to why the patent examiner repeatedly rejected the patent's claims before ultimately accepting them.[12] In his first rejection, the examiner indicated: "While the particular softener employed does not appear to be critical, nevertheless, it is not apparent that any and all fabric softeners as claimed in claims 1 and 17 ... would be suitable for applicants' purpose. ... Claims 1, 2, 6, and 17 are rejected as fully met by the Gaiser patent under 35 U.S.C. 102." ('025 FW at 79–80.) In his second rejection, the examiner noted: "Claims 1 and 6 are rejected under 35 U.S.C. 103 as unpatentable over the Scheuer patent. This reference discloses quaternary ammonium compounds within the scope of the softener herein...." ('025 FW at 102–03.)

The examiner's "final" rejection stated: "Claims 1 [etc.] are rejected under 35 U.S.C. 103 as unpatentable over the Lerner et al patent alone or in combination with the Gaiser patent. The Lerner patent discloses quaternary ammonium compounds within the scope of the softeners claimed herein...." ('025 FW at 126.)

In what on its face appears to be a direct response to the patent examiner's two references to unpatentability of the claims asserting the fabric softeners comprising "quaternary ammonium compounds," Morton's application was amended to delete its claim over fabric softeners "from the group consisting of ... cationic quaternary ammonium salts" ('025 FW at 139), of which DDAMS is a member. As amended, the claim was allowed as patentable. Having demonstrated the foregoing, Lever/Prescott have made out a *prima facie* case that the Morton '025 claim was specifically amended, in order to avoid a prior art rejection, to exclude fabric softeners from the group of cationic quaternary ammonium salts. Therefore, P & G has the burden of demonstrating why it is not

---

**12.** I emphasize the inquiry does not consider the propriety of the examiner's actions.

estopped from challenging Lever/Prescott's use of DDAMS.

P & G has not come forward with a satisfactory explanation for the above-cited history concerning the '025 patent application. P & G has submitted the declaration of Eugene Rzucidlo, who, with fifteen years of experience in the Patent Office (five of those years as acting Examiner-in-Chief) would appear to be eminently qualified to explain why the prosecution history of the '025 patent should not estop P & G from claiming infringement against products implementing fabric softeners from the group of cationic quaternary ammonium salts. Rzucidlo's opinion on the issue is unequivocal: "Based upon my background and training and a detailed review of the histories of both applications, I do not believe that the actions taken during the prosecution history of either application prevent the claims from covering DDAMS or PEGS and their combination." (Rzucidlo Decl., 1/2/86, ¶ 11.) However, Rule 56(e) requires "specific facts;" the Rzucidlo declaration sets forth little in the way of facts to support his opinion.

The Rzucidlo declaration suggests the '025 patent application was directed primarily toward protecting Morton's improvements on the substrate sheet, thus implying that the particular types of fabric softeners claimed were unimportant in the overall scheme of the patent application. Although the observation may be accurate, Rzucidlo's declaration ignores the fact the patent examiner specifically rejected the patent application, at least in part because it claimed fabric softeners from the group of quaternary ammonium compounds. Moreover, the court's inquiry is not to be directed toward whether the patent examiner's rejection was justified, or whether an amendment in response to a rejection was necessary to obtain the patent. *See Prodyne Enterprises,* 743 F.2d at 1583; *Kinzenbaw,* 741 F.2d at 389. Rather, if an element of a claim is "amended out" of the patent application in response to a prior art rejection, a court must recognize and give effect to the amendment.

Clearly, the patent examiner handling the '025 patent application was concerned about the scope of the claim's reach over fabric softeners. Just as clearly, P & G amended its claim to address that concern. Lever/Prescott employees have sworn they relied on that amendment in determining to develop and go forward with their product, Snuggle. (Tinebra Aff., 11/25/85, ¶ 13; Hockey Aff., 11/25/85, ¶ 25.) In opposition to this motion for summary judgment, P & G failed to explain why a competitor interested in producing a fabric softener product might not reasonably rely on the '025 patent application's amendment to produce such a product with fabric softeners from the group of cationic quaternary ammonium salts.[13]

Given the summary judgment pronouncements of the Supreme Court in *Matsushita,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538, *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, and *Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, P & G has failed to carry its burden on this point. Accordingly, I find P & G is estopped from claiming the Snuggle product infringes on the '025 patent on the ground DDAMS is equivalent to the fabric softeners claimed in the '025 patent.

### 2. '395 Patent

■ The issue in this motion of whether the '395 prosecution history establishes that the fabric softener PEGS cannot be encompassed by the '395 patent boils down to whether there is a reasonable dispute of fact as to why the patent examiner summarily allowed the '395 claim after his initial rejection. As noted earlier, the patent examiner rejected the original claim (which covered fabric softeners generally) in part because: "These claims do not define the fabric softeners as they are defined in the claims of Patent No. 3,686,025. The fabric softeners should be defined as they are defined in the claims of the patent." ('395 FW at 82.) In response to the rejection, the claim was modified, but not in the manner specified by the patent examiner. Nonetheless, the amended claim was ap-

---

**13.** *See Prodyne Enterprises,* 743 F.2d at 1583; *Kinzenbaw,* 741 F.2d at 389.

proved without comment. ('395 FW at 106.)

Lever/Prescott argue, as they argued with respect to the '025 patent history, that the amendment in the '395 prosecution which narrowed the range of fabric softeners covered by the patent from *all* fabric softeners to specified classes not literally encompassing the softener, PEGS, estops P & G from asserting infringement against a product using PEGS as a softener. Unlike the '025 prosecution history, however, the '395 prosecution history does not establish that the limiting amendment as to fabric softeners was made to avoid a rejection based on the prior art. Unlike the '025 history, in which the patent examiner twice rejected the claimed fabric softeners because prior patents disclosed "quaternary ammonium compounds," the '395 prosecution history is ambiguous.

The Rzucidlo declaration states in conclusory terms, with little factual support: "Based on the prosecution history, it is clear that the Examiner's basis for allowing the claims was not that they were limited to the use of a particular softener in the method." (Rzucidlo Decl., 1/2/86, ¶ 20.) Although I question Rzucidlo's opinion that the Examiner's basis for allowing the claims is "clear," there appears to be at least an issue of fact whether the amendment made was as limiting as Lever/Prescott urge, and whether counsel for Morton intended to forsake a claim over the group of fabric softeners of which PEGS is a member. Accordingly, I cannot enter summary judgment that the prosecution history of the '395 patent estops P & G from asserting infringment against a product utilizing the fabric softener PEGS.

■ Lever/Prescott argue in the alternative that even if a product containing the fabric softener PEGS could be found to infringe upon the '395 patent, the Snuggle product could not, as a matter of law, be found to infringe the '395 patent because Snuggle is manufactured with a fabric softener-to-substrate weight ratio different from the ratio specified in the '395 patent. Lever/Prescott argue that the '395 patent's specified weight ratio range, between 10:1

and 2:1, must be read literally. Because Prescott's dryer-added fabric softener products have never been manufactured according to specifications exceeding a 1.92:1 weight ratio, and because Snuggle's specified softener-to-substrate weight ratio has, according to Lever/Prescott, never exceeded 1.54:1, Lever/Prescott argue their product cannot infringe the '395 patent. P & G counters that this argument is too "wooden" to be accepted, and that the 1.92:1 or 1.54:1 softener-to-substrate weight ratios can and should be considered functional equivalents of the '395 patent's minimum 2.0:1 specification. The question, therefore, is whether there is a genuine issue of material fact that the '395 patent's 10:1 to 2:1 weight ratio specification should not be read literally.

The '395 patent's file wrapper indicates the specified 10:1 to 2:1 softener-to-substrate ratio was unchanged during the prosecution history of the patent. The remarks of counsel for Morton accompanying the patent application refer to the specified weight ratio range, but they do not suggest the exact specifications are critical to the invention. At most, the comments of Morton's counsel suggest the specified weight ratio is a distinctive feature of the '395 claims: "Finally, the weight ratio of the softener to the dry substrate must be within the range of from 10:1 to 2:1." ('395 FW at 100.) Indeed, the remarks of counsel in the original '025 patent application indicate the specified weight ratios were not literally critical: "Preferably, the amount of the softening agent impregnated is from *about* 4:1 to *about* 2:1, particularly 3:1, by weight of the dry untreated substrate." ('025 FW at 36 (emphasis added).)

Lever/Prescott have not come forward with evidence to refute Rzucidlo's conclusion that: "There is nothing in the prosecution history that would indicate that the specific ratio range of from 10:1 to 2:1 cited in the claims was critical to distinguish the claims from the prior art." (Rzucidlo Decl., 1/2/86, ¶ 21.) Accordingly, I find there is a genuine issue of material fact about whether the weight ratios specified in the '395 patent are to be interpreted

literally to preclude entering summary judgment in Lever/Prescott's favor.[14]

## B. *Implied License, Estoppel and Laches*

Lever/Prescott argue that even if it were determined Snuggle could be found to infringe the Morton patents via the doctrine of equivalents, P & G should be barred from asserting infringement against Lever/Prescott under the doctrines of implied license, estoppel and laches. The factual basis for Lever/Prescott's argument is relatively undisputed by the parties.

In 1976, P & G granted to Prescott a license under the Gaiser patent, so that Prescott might manufacture and sell a dryer-added fabric softener product. During negotiation of the necessary licensing arrangements between P & G and Prescott, and after examining samples submitted by Prescott, P & G indicated the sample products supplied by Prescott would infringe certain of the McQueary patents covering airflow through the substrate sheets. Accordingly, the parties negotiated a licensing agreement for Prescott to manufacture sheets utilizing certain of the McQueary inventions.

Both parties were aware of the Morton patents owned by P & G at the time these negotiations were occurring; yet neither party raised the issue of whether Prescott's proposed sheets would infringe upon the Morton patents. The parties dispute whether P & G officials advised Prescott officials that with licenses under the Gaiser and McQueary patents, Prescott would be able to produce dryer-added fabric softener products free and clear from P & G charges of infringement. (Tinebra Aff., 11/25/85, ¶¶ 9, 13; Brunner Aff., 1/16/86, ¶¶ 8(c), 9.)

Armed with licenses under the Gaiser and McQueary patents, in 1977 Prescott began to develop, manufacture and sell dryer-added fabric softener products. The substrate sheet and basic chemical composition of Prescott's product has, since 1977, remained largely unchanged. It also appears P & G has been aware of the nature of Prescott's product, at least with respect to its softener-to-substrate weight ratio, since 1977. Prescott, and later its principal customer, Lever, have expended significant sums in their efforts to develop, produce and market the Snuggle product and P & G, at least on the record before me, does not indicate it has been unaware of these expenditures. At the least, P & G has been aware of its receipt of more than $2 million in royalties from Prescott pursuant to the Gaiser and McQueary licensing agreements. Prescott/Lever claim such facts, as a matter of law, give rise to the defenses of implied license, estoppel and laches against P & G's infringement action. P & G counters that controlling case law precludes the court from granting Lever/Prescott's motion for summary judgment on these defenses.

### 1. *Implied License*

■ Even the cases upon which Lever/Prescott rely in support of their implied license defense suggest there are several elements of the defense which Lever/Prescott have not demonstrated, given the standards governing motions for summary judgment. In both *Lukens Steel Co. v. American Locomotive Co.*, 197 F.2d 939 (2d Cir.1952), and *National Rubber Machinery Co. v. McNeil Machine & Engineering Co.*, 132 F.2d 436 (6th Cir.1942), in which implied license defenses were upheld, the courts indicated that to maintain an implied license defense, the alleged infringer must demonstrate the patent for which an implied license was sought was *necessary* for the alleged infringer to make use of explicitly granted rights.

In *McNeil Machine*, for example, the court quoted a prior decision: "There is ample authority for the rule that where the owner of a patent grants to a licensee the

---

14. I note, although it does not influence my decision on this point, that Lever/Prescott admit Snuggle sheets occasionally are manufactured with a fabric softener-to-substrate weight ratio exceeding 2.0:1. (Tinebra Aff., 11/25/85, ¶ 19.) The parties have not vigorously argued whether the relatively small number of Snuggle sheets manufactured with a ratio greater than 2.0:1 is sufficiently significant to support a claim for infringement.

right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the grant." *McNeil Machine*, 132 F.2d at 438, *quoting, Frederick B. Stevens, Inc. v. Steel & Tubes, Inc.*, 114 F.2d 815, 819–20 (6th Cir.1940). Similarly, in *Lukens Steel*, the court pointed out: "A grant necessarily carries with it that without which the thing granted cannot be enjoyed." *Lukens Steel*, 197 F.2d at 941 (footnote omitted).

This same point was emphasized more recently in *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903 (Fed.Cir.1984), a case in which a claim of implied license was rejected. One reason the defense was rejected was because the alleged infringer failed to demonstrate that that which the patent owner had granted could not be utilized in a noninfringing manner: "First, no license can be implied, where as here, the equipment involved has other noninfringing uses . . . ." *Id.* at 924–25 (citations omitted).

Neither party has submitted evidence to indicate whether a fabric softening product manufactured in accordance with licenses granted under the Gaiser and McQueary patents alone would necessarily infringe on the Morton patents.[15] Presumably, however, the Gaiser and Morton patents cover different inventions and a Gaiser/McQueary-licensed fabric softener could be manufactured that would steer clear of the Morton inventions. At least on this motion for summary judgment, where reasonable inferences must be drawn in favor of the party opposing summary judgment, I must find that the Morton patents were not necessary in order for Lever/Prescott to utilize the Gaiser and McQueary licenses.

A related element of the implied license defense suggested by the *Lukens Steel* and *McNeil Machinery* excerpts, cited above, is that the patent owner who has granted certain rights and from whom correlative implied rights are later sought,

must be shown to have known that the implied rights were necessary to enable the licensee to enjoy the granted rights. In *Lukens*, for example, the licensor knew that the engine frames it permitted the licensee to manufacture would be manufactured according to a specific design which the licensor had patented. And in *McNeil Machinery*, the licensor knew that the very machines it was licensing the licensee to manufacture were close to becoming patented.

In the submissions concerning this motion, Lever/Prescott have not demonstrated that P & G knew, at the time it licensed the Gaiser and McQueary patents to Prescott, the Morton patents would be needed by Prescott in order to produce a fabric softening product. As stated above, absent evidence in the record to the contrary, on a motion for summary judgment P & G must be presumed to have understood Lever/Prescott would manufacture a product that would not infringe the Morton patents.

One other element of the implied license defense is at issue and precludes a summary pronouncement in favor of an implied license under the Morton patents. The party seeking invocation of the implied license doctrine must demonstrate "[a]ny language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent. . . ." *Lukens Steel*, 197 F.2d at 941, *quoting, DeForest Radio Telephone Co. v. United States*, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). Although Lever/Prescott urge that P & G's silence about the Morton patents during negotiations over the Gaiser and McQueary patents can constitute affirmative conduct on the part of P & G sufficient to support an implied license theory, recent cases suggest otherwise.

In *H.M. Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed.Cir.1983), the Court rejected a claim of implied license in part because of an absence of proof of conduct on the part

---

**15.** At oral argument, counsel for P & G asserted a competitive product could be produced utiliz-

ing the Gaiser and McQueary inventions. (Transcript, pp. 49–50.)

of the patent holder to lead the licensee to a reasonable belief that an implied license had been granted:

One common thread in cases in which equitable estoppel applies is that the actor committed himself to act, and indeed acted, as a direct consequence of another's conduct.... Thus, an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party.

*Id.* at 1559 (citation omitted). *See also Al Bolser's Tire Store,* 750 F.2d at 925. P & G stresses that during the licensing negotiations with Prescott, no licenses other than those granted under Gaiser and McQueary were made and Prescott clearly understood the point. P & G points to the exclusivity clauses in its licensing agreements (Witte Aff., 1/14/86, Ex. C at 5, Ex. K at 6) and to notes taken by Prescott during the negotiations (Feiler Aff, 1/17/86, Exs. H, I), to show Prescott knew that no other licenses, implicit or explicit, were being granted under the Morton patents. On the face of the record, therefore, P & G has demonstrated a genuine issue of material fact as to whether implied licenses were granted under the Morton patents.

### 2. *Estoppel*

■ To prevail in this summary judgment motion on their defense of estoppel, Lever/Prescott must show there is no genuine issue of material fact on four points: "(1) an unreasonable and inexcusable delay, (2) prejudice to the defendant [Lever/Prescott], (3) affirmative conduct by the patentee [P & G] inducing the belief it had abandoned its claims against the alleged infringer [Lever/Prescott], and (4) detrimental reliance by the infringer." *Young Engineers, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d 1305, 1317 (Fed.Cir.1983) (citation omitted). A finding in Lever/Prescott's favor on the estoppel defense would have significant effect: "Estoppel forecloses the patentee from enforcing his patent prospectively through an injunction or through damages for continuing infringement." *Studiengesellschaft*

*Kohle, mbH v. Eastman Kodak Co.,* 616 F.2d 1315, 1325 (5th Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

Lever/Prescott urge that P & G's failure to raise the issue of the Morton patents during and after negotiation of the licensing agreements with Prescott in 1976, particularly in light of P & G's having raised the issue of the McQueary patents, constitutes the affirmative conduct necessary to give rise to an estoppel. In addition, Lever/Prescott point out documents from 1976 and 1977 indicate P & G was aware at that time Prescott was manufacturing dryer-added fabric softener products with fabric softener-to-substrate weight ratios of approximately 2:1. (Lever/Prescott Exs. O, Q.) Those documents, however, do not indicate P & G was aware of the actual chemical composition of Prescott's fabric-softening products. Lever/Prescott suggest these facts demonstrate P & G should be estopped from bringing an infringement claim based on its Morton patents. As was discussed above in connection with Lever/Prescott's implied license argument, however, the record supporting this motion does not indicate P & G undertook the type of *affirmative* conduct necessary to support an estoppel. Accordingly, the remaining elements of estoppel need not be discussed.

Numerous patent infringement cases addressing the issue support this conclusion. *See, e.g., Studiengesellschaft Kohle, mbH v. Dart Industries, Inc.,* 726 F.2d 724, 728–29 (Fed.Cir.1984) (after refusing to grant defendant a license to use its patent, patent holder's five year silence does not give rise to estoppel defense because "something more than simple silence must be shown to support an estoppel"); *TWM Manufacturing Co., Inc. v. Dura Corp.,* 722 F.2d 1261, 1268 (6th Cir.1983) ("Mere silence is not sufficient [to give rise to estoppel]; the defendant must show 'misrepresentation, affirmative acts of misconduct, or intentionally misleading silence by the plaintiff.'"), *quoting TWM Manufacturing Co., Inc. v. Dura Corp.,* 592 F.2d 346, 350 (6th Cir.1979); *Olympia Werke Aktiengesells-*

*chaft v. General Elec. Co.,* 712 F.2d 74, 77 (4th Cir.1983).

A survey of pertinent cases suggests the estoppel defense has been successfully asserted in patent infringement actions where the patent holder either (1) threatens an alleged infringer with suit but then delays bringing suit for an unreasonably long period of time, or (2) engages in conduct which would lead its competitors reasonably to conclude the patent had been abandoned. *See, e.g., Olympia Werke,* 712 F.2d at 80 (estoppel lies where patent holder's conduct led competitors to believe use of patent would be "unmolested"); *A.C. Aukerman Co. v. Miller Formless Co., Inc.,* 693 F.2d 697, 702 (7th Cir.1982) (estoppel lies where seven year delay, "coupled with the repeated but unimplemented threats of enforcement," led defendant to act); *Naxon Telesign Corp. v. Bunker Ramo Corp.,* 686 F.2d 1258, 1266–67 (7th Cir.1982) (estoppel lies where suit delayed 58 months from initial notice of potential infringement); *Jensen v. Western Irrigation and Manufacturing, Inc.,* 650 F.2d 165, 169 (9th Cir.1980) (estoppel lies where patent holder delayed suit from eight to ten years after notifying defendant of possible infringement); *Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 646 F.Supp. 1495, 1501 (D. Conn. 1986) (estoppel lies where patent holder's conduct, during twelve years it knew of alleged infringement, led defendant to believe its business would be "unmolested"); *MGA, Inc. v. Centri-Spray Corp.,* 639 F.Supp. 1238, 1244–46 (E.D. Mich. 1986) (estoppel lies where patent holder delayed bringing suit for eight years from date of initial warning of infringement); *In re Yarn Processing Patent Validity Litigation,* 602 F.Supp. 159, 172–73 (D.N.C.1984) (estoppel lies where patent holder's conduct during lengthy delay effectively induced infringement).

In light of the licensing agreement's express provisions that no other licenses, implied or otherwise, were granted by P & G, the failure of P & G (as well as Prescott) to raise the issue of the Morton patents does not, at least for purposes of this motion for summary judgment, amount to affirmative conduct on the part of P & G such as would give rise to an estoppel. In addition, as is discussed below in connection with the laches argument, I am unconvinced P & G's delay in bringing its infringement action was "unreasonable or inexcusable" as a matter of law. Therefore, Lever/Prescott's motion for summary judgment that P & G is estopped from asserting infringement of its Morton patents must be denied.

### 3. *Laches*

■ To prevail in this motion on the laches argument, Lever/Prescott must demonstrate the absence of a genuine issue of material fact on two grounds: "(1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice to the defendant resulting from this delay...." *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 741 (Fed.Cir.1984) (citation omitted). A finding in Lever/Prescott's favor on the laches argument would not have so severe an impact as would such a finding on the estoppel claim: "The effect of laches is merely to withhold damages for infringement which occurred prior to the filing of the suit." *Kodak,* 616 F.2d at 1325 (citation omitted).

To determine whether P & G's alleged delay in bringing its claims of infringement on the Morton patents was unreasonable or inexcusable, the length of the delay must be measured. To assess when the alleged delay began, the court must look "to the time at which the plaintiff knew, or in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action." *Kodak,* 616 F.2d at 1326. Because the record presented to me does not provide a conclusive basis for determining when P & G knew or reasonably should have known of the asserted infringement on the Morton patents, Lever/Prescott's motion for summary judgment on its laches defense must be denied.

Nothing contained in the record specifically indicates when P & G actually knew of the alleged infringement on its Morton patents. I note, however, some suggestion in the record that P & G may have had reason to know of the alleged infringement

in early 1977. Lever's answer to P & G's complaint alleging infringement of the Morton patents refers to two patent actions commenced in 1977, each involving P & G and concerning patents for dryer-added fabric softener products. (Lever Answer, filed 6/12/85 at ¶¶ 43–47.) Although the allegations contained in Lever's answer do not indicate P & G directly confronted or resolved issues regarding infringement of the '025 and '395 patents in those cases, they at least suggest P & G may have had reason to know of the alleged infringement in early 1977.

On the other hand, at least some case law suggests a patent holder should not be charged with constructive knowledge of potential patent infringement until the infringement becomes, in some sense, significant. In *Johnson & Johnson v. W.L. Gore & Associates, Inc.,* 436 F.Supp. 704 (D.Del. 1977), the court rejected a laches defense despite some indication the alleged infringement had been occurring for many years prior to the institution of suit. According to the court, sales of the infringing product were "minimal" early on, and the patent holder "acted promptly" when it "learned of [the infringer's] plans to begin to market the [infringing product] widely...." *Id.* at 733–34. A similar result obtained in *Studiengesellschaft Kohle, mbH v. Dart Industries, Inc.,* 549 F.Supp. 716 (D.Del.1982), *aff'd,* 726 F.2d 724 (Fed. Cir.1984). In that case, the district court was found to have properly exercised its discretion in rejecting an asserted laches defense. The district court found that although it was likely the patent holder knew generally the defendant was producing a competitive product, it was "plausible" the patent holder "was not aware of the specifics" of the infringer's "process" or of a particular "catalyst" used in the process. 549 F.Supp. at 754–55. These cases suggest there may be legal ground for P & G to argue it should not be deemed to have known of the alleged infringement until Lever began heavily promoting its Snuggle product.

The parties have contested whether the assertion of laches against P & G is, as a matter of law, a defense "personal" to Prescott and thus unavailable to Lever. Lever claims it may argue laches, citing *Van Alen v. Aluminum Co. of America,* 43 F.Supp. 833, 838 (S.D.N.Y.1942) (since co-defendant in patent infringement action "is but a customer of defendant, it is covered by the protection which laches affords the latter"), and *Boyle Leather Goods Co., Inc. v. Feldman,* 30 F.Supp. 914, 915 (S.D. N.Y.) (same), *rev'd on other grounds,* 113 F.2d 261 (2d Cir.1940). P & G contests this point, citing *Pierce v. American Communications Co., Inc.,* 111 F.Supp. 181, 190 (D.Mass.) (laches is a "personal" defense and lessee of equipment cannot defend against patent infringement action with lessor's claim of laches), *vacated on other grounds,* 208 F.2d 763 (1st Cir.1953), and *Salem Engineering Co. v. National Supply Co.,* 75 F.Supp. 993, 1000 (W.D.Pa. 1948) (intervenor's laches defense stricken where original defendant could not have asserted it). In light of my disposition of the laches defense above, this contention between the parties need not be addressed.

Finally, P & G has suggested there can be no laches defense to its infringement claim brought against the makers and sellers of the Snuggle product, because Snuggle is different from previous dryer-added fabric softeners produced by Prescott. (P & G Brief, 1/20/86, at p. 55 fn.) Again, I need not address the issue because of my earlier resolution of the laches argument. However, I note Lever/Prescott have asserted what appears to be a compelling rebuttal to this point: that Snuggle is not materially different from prior Prescott products, at least with respect to those aspects of the product which allegedly infringe the Morton patents.

*Conclusion*

Because the prosecution history of the '025 patent demonstrates no genuine issue of material fact that the '025 patent application was amended to exclude the class of compounds including DDAMS, the motion for summary judgment that P & G is estopped from asserting that the Snuggle product infringes the '025 patent with respect to fabric softeners claimed in the '025 patent is granted. Genuine issues

of material fact preclude entry of summary judgment on all other aspects of the motion.